UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSIER JEUNES                    :
                                 :
v.                               :    CIV. NO. 3:08CV1218(HBF)
                                 :
JOHN E. POTTER,                  :
POSTMASTER GENERAL               :
                                 :
                                 :
                                 :

## RULING ON MOTION FOR SUMMARY JUDGMENT

Josier Jeunes, the plaintiff, brought this action against his former employer, John E. Potter, Postmaster General, United States Postal Service ("Postal Service"), alleging that the Postal Service discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), on the basis of his race (black), and national origin (Haitian), when it terminated his employment.  For the reasons that follow, the Postal Service's Motion for Summary Judgment **[Doc. #17]** is **GRANTED** in part and **DENIED as moot** in part.

I.

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the

non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." Id. In short, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.' " Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[s]ummary judgment is appropriate even in discrimination cases," Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), where a plaintiff's argument is "based on conclusory allegations

of discrimination and the employer provides a legitimate rationale for its conduct, . . ." Tojzan v. N.Y. Presbyterian Hosp., No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. March 31, 2003).


                              II.

     Based on the parties' Local Rule 56(a) Statements, summary judgment briefs, and the exhibits provided, the following facts are undisputed.[1]

     The plaintiff, Josier Jeunes, was a Regular Rural Carrier for the defendant, the United States Postal Service ("USPS" or "Postal Service"), and stationed at the New Fairfield Post Office. [Def. 56(a)(1) Stat., Doc. #17-3, ¶1]. Jeunes is a black male (African American, of Haitian origin). Id. ¶2.

     Jacob Williams is a brown-skinned Asian male. He is Manager of Customer Services at the New Fairfield Post Office. Id. ¶3.

     Walter Gasiewski is a white male and Supervisor of Customer

_____

     [1]Plaintiff admitted to the facts set forth in paragraphs 1-35, 37-56 and 58-63, of defendant's Local Rule 56(a)(1) Statement. Plaintiff "agreed in part" to information contained in paragraphs 6, 8, 25, 38 and 57 and that information has been included in these findings.  Initially, plaintiff failed to respond to defendant's Local Rule 56(a)(1) Statement paragraphs 40-63. Plaintiff states that the failure to respond to these paragraphs was "due to a clerical oversight," [doc. #23 at 1], and he filed an amended statement of material facts in dispute responding to these paragraphs.

Service. Id. ¶4.

Thomas Nichols is a white male and a Rural Carrier Associate at the New Fairfield Post Office. Id. ¶5.

Jeunes had several co-workers at the New Fairfield Post Office, including, but not limited to, Wayne Garcia, Patricia Lamson, Vincenzo Gentili, and John Coscia.[2]  Id. ¶6.

On October 26, 2007, at approximately 11:00AM, a dispute took place between Jeunes and Thomas Nichols at the New Fairfield Post Office. Id. ¶7.  Following the incident, the Postal Service conducted an investigation by gathering statements from the people present at the time of the incident. Id. ¶8.

On October 26, 2007, Nichols provided a written statement to the Postal Service regarding the incident.  He wrote,

> at approximately 11:00AM Josier was loading his vehicle to go on the road . . . . I was casing mail and told him I put a small parcel in the throw-back case that was his, if he wanted to take it out.  I didn't think he hear me . . . . I was standing in front of my

---

[2]Plaintiff contends that there were three other co-workers present on October 26, 2007, who were witnesses to the incident but not interviewed by the Postal Service.  Pl. 56(a)(2) Stat. ¶9. They are Alan Paradise, Jennifer Figueras and Gilson Almeida. Id. ¶9. Defendant asks the Court to disregard plaintiff's references to Paradise, Figueras and Almeida because they were not disclosed in interrogatory responses when plaintiff was asked to list every witness to the alleged discriminatory events, def. Ex. 3 at 2-4, interrog. nos. 3, 5, 7, nor did plaintiff identify these witnesses during his deposition. Def. Ex. 1. The first time that plaintiff mentions these three individuals is by affidavit in opposition to summary judgment. [Doc. 21-3, Jeunes Aff. ¶8]. However, the affidavit does not contain any information regarding what the witnesses saw or what they would have said if the Postal Service had interviewed them.

case and told him I wasn't sure if he heard
me and repeated the information about the
small parcel.  His reaction was "why you
fucking bothering me. Whats [sic] your
fucking problem."  I told him I simply wanted
to let him know. [Josier] said "I already
pulled down you fucking asshole" and
continued cursing at me.  I stood in front of
my case in shock, not knowing what this was
all about.  At this point Wayne [Garcia]
stood in front of me trying to calm down the
situation. Wayne and I were at the case and
Josier was near the restrooms.  I told Josier
that I believed there was a zero tolerance
for cursing in the Post Office. He said "so
report me[."] I said I would and [Josier]
said "do what you gotta do[."] I said I
would.

At this point [Josier] became more
threatening egging me on to go outside. When
I wouldn't go, he called me a fucking pussy.
[Josier] now walked to the stairs, still
cursing me and calling me a fucking pussy
because I wouldn't go outside. I stood near
my case with Wayne [Garcia] letting Josier
know I was gonna report this nonsense. He
just kept calling me a fucking pussy and
telling me "Do what you gotta do." Then he
left.

I'm a 57 year old man being threatened by a
31 year old man simply for doing my job[.] To
be cursed and screamed at so loudly in a work
place by a co-worker that you never had a
problem with is not only strange[] but
embarassing.

Id. ¶10.

On October 26, 2007, Walter Gasiewski provided a written

statement to the Postal Service regarding an interview he

conducted with Nichols following the incident.  Id. ¶11.  In his

statement Gasiewski wrote,

At approximately 11:00 Friday morning Tom
Nicols and Josier Jeunes were involved in an
altercation which resulted in a verbal
shouting match.  I interviewed Tom Nichols at
12:00 this day and Tom told me the following:

Tom received a unscannable small parcel in
his parcel hamper that was not for his route,
but was for Josier['s] route.  Josier had
already pulled down his case and was outside
loading his truck.  Tom put this parcel in
the throwback case. When Josier came back
inside . . . Tom told [Josier] that he put a
parcel for [Josier's] route in the throwback
case.  Josier never acknowledged Tom. Tom,
thinking Josier didn't hear him, again told
Josier about this parcel.  Josier then told
Tom to shut up and mind his own business.
Josier told Tom that he already pulled down
his case and loaded his truck and exploded
into a stream of profanities directed at Tom.
Tom stated that Josier got very mad and the
two of them came together and Josier told Tom
to do what he had to do, and told Tom to step
outside.  When Tom didn't Josier continued
with . . . the profanity.  As the two came
together there was no physical contact, just
the verbal shouting.  Upon hearing this
shouting a window clerk Wayne Garcia came
running back and stepped in the middle of
them and told them both to break it up.
Josier then left to go to the street to
deliver his mail and Tom went back to his
case.  Tom Nichols stated that he didn't do
anything to antagonize Josier, but was very
courteous, in telling Josier where he put his
package.  According to Tom, Josier just
exploded into a rage at no fault of Tom's.
Tom states he played it cool, and never used
any profanity directed or did anything to
antagonize Josier during this altercation.

Id. ¶12.

On October 26, 2007, Patricia Lamson provided a written

witness statement to the Postal Service regarding the incident.

6

Id. ¶13.   In her statement, Lamson wrote,

> Tom [N]ickels [sic] said, "Josier, I found
> some parcels that are yours, I put them in
> the throw back case[."] Josier failed to
> respond.  Tom tried to explain courteously,
> but the situation continued to escalate.
> From what I remember, Josier replied by
> saying the following, "Just leave me alone,
> why are you fucking with me.  You fucking
> asshole fuck you, you want to bring it on,
> come on!"  Josier continued to engage in a
> verbal fight with [T]om.  Josier repeated
> multiple times, "bring it on pussy[."] Josie
> made it clear he was willing to fight Tom.
> During this altercation, Tom never left his
> case and he never proceeded to use foul
> language. Wayne Garcia asked Josier to,
> "Quiet down [.]" Josier continued to verbally
> intimidate [T]om. Wayne Garcia then told
> Josier to, "Leave the building before you get
> fired[."] For everyone's safety, I called the
> Danbury Post Office to alert them of the
> event that had occurred.  Josier left the
> building.  During this event I was ready to
> call 911.  This behavior is totally uncalled
> for and is disturbing in the workplace. I
> feel uncomfortable to work with an individual
> knowing that a situation like this may occur
> again.

Id. ¶14.

On November 5, 2007, Jacob Williams sent a letter to Lamson as part of his continuing investigation of the alleged incident between Jeunes and Nichols.  Williams asked Lamson to explain what she meant in her witness statement when she said that she felt "uncomfortable working next to an individual knowing that this might happen again."  Williams asked Lamson to state "why you feel [a] situation like this may occur again." Id. ¶15.

In her response, dated November 6, 2007, Lamson explained,

> In the past, Josier Jeunes was taken out in
> handcuffs by the Police and arrested from New
> Fairfield Post Office because of his behavior
> outside the post office.  When Josier is
> confronted by the management on different
> issues at work, he had a tendency to get
> angry.  When he gets angry, he slams mail in
> to the case hard, argues with the management
> and walks out.  The anger and the body
> language he projects is disturbing in the
> work place and has risen to another level.

Id. ¶16.

On February 15, 2007, the Postal Service's Office of
Inspector General issued an investigation report on Jeunes. The
investigation was initiated after Jeunes' arrest by the Waterbury
Police on December 2, 2005, at the New Fairfield Post Office.
Id. ¶17.  A criminal history check of Jeunes revealed that on
November 9, 2006, Jeunes pleaded guilty to creating a public
disturbance arising from his December 2005 arrest.  Id. ¶18.  On
February 25, 2003, Jeunes pleaded guilty to Second Degree
Assault, a D felony, in violation of Conn. Gen. Stat. §53a-60,
and Breach of Peace, a B misdemeanor, in violation of Conn. Gen.
Stat. §53a-181.  Id. ¶19.  Jeunes did not disclose the felony
conviction to the Postal Service; the Postal Service learned of
the conviction through the Inspector General's report.  Id. ¶20.

On October 27, 2007, Vincenzo Gentili provided a written
witness statement to the Postal Service regarding the incident.
Id. ¶21.  In his statement, Gentili wrote,

> Tom [Nichols] said ["]I found a small parcel

> it's in [the] throwback case, if you want
> [it] it's there if you don't want it it's
> there.["] Josier was at the clock and this is
> what I heard. That I can remember, ["]Bring
> it on[."] He said with open arms like he
> wanted to fight. ["]I'm not scared, pussy[."]
> I remember Wayne [Garcia] coming to calm
> things down. [Garcia] said ["]quiet down and
> leave the building.["] Tom never left his
> case. Patty [Lamson] called on phone, Josier
> left the building.

Id. ¶22.

On October 26, 2007, John Coscia provided a written witness statement to the Postal Service regarding the incident. Id. ¶23. In his statement, Coscia wrote, "Tom Nichols informed Josier that he had one of Josier's parcels, and Josier became very annoyed and belligerent." Id. ¶24.

Jacob Williams interviewed Wayne Garcia on October 29, 2007, regarding the "Zero tolerance" incident. Williams wrote,

> Wayne [Garcia] stated that he was taking care
> of a customer at the window and hear loud
> shouting. He finished the transaction he was
> working on and came down to the area where
> the shouting was going on.
>
> Wayne doesn't know how this got started but
> heard profanity being used. Wayne also stated
> that he heard the "F" and "P" word. Wayne
> didn't hear Tom Nichols using profanity.
> Wayne said he got in between the 2
> individuals and asked Josier to leave to the
> street and asked Tom Nichols to face the
> case.

Id. ¶25.

On October 26, 2007, George Jacob, Supervisor of Customer

Service at the Danbury Post Office, provided a written statement

regarding the telephone call he received from Patricia Lamson.

Id. ¶26.  In his statement, Jacob wrote,

> On Friday, October 26, 2007, at approx. 11am
> I received a phone call from Patricia Lamson
> stating that there was an altercation between
> Josier Jeunes and Tom Nichols.  She stated
> that Josier was shouting profanity at Tom and
> Wayne Garcia intercepted and told them to
> break it up. When Patty said that she was
> going to call the Danbury office, Josier took
> [the] rest of his mail and went to his truck
> and left.   Tom Nichols went back to his case.
> Patty stated that Josier was way out of line
> and kept swearing at Tom. [Patty] said that
> Tom only told [Josier] that he has a small
> parcel that was in the throwback case.
>
> I told Walter Gasiewski to go back to New
> Fairfield and interview Tom Nichols and
> Josier Jeunes which he did and reported back
> to Backus Ave. [Walter] interviewed Tom
> Nichols before he left for the street at
> approx. 1:15 pm. I called the Postmaster Phil
> Gioia on his cell phone and reported the
> incident [Postmaster Gioia] in turn notified
> Jacob Williams, the manager of New Fairfield
> PO.

Id. ¶27.

Other than his own personal recollection of the incident,

Jeunes has no evidence that anyone gave false statements.  Id.

¶28.

On October 29, 2007, the Postal Service placed Jeunes in

emergency off-duty status without pay.  Id. ¶29.  On November 7,

2007, Williams conducted a Pre-Disciplinary Interview (PDI) with

Jeunes, concerning Jeunes' conduct on October 26, 2006.  Id. ¶30.

Jeunes answered Williams' questions and disputed the written

statements of his co-workers.  Id. ¶31.  During the interview

with Williams, Jeunes admitted he was aware of the Postal

Service's Zero Tolerance Policy.  Id. ¶32.  The Postal Service

Connecticut District Zero Tolerance Policy issued February 26,

2007, states in part,

> **THERE WILL BE ZERO TOLERANCE OF ACTS OR**
> **THREATS OF VIOLENCE IN OUR WORKPLACE**
>
> This includes but is not limited to:
> - Any act of physical violence
> - any actual, implied, or veiled
>   threat made seriously or in jest
> - Any type of vulgar language which
>   would lead to a hostile workplace
>
> In order to protect the overwhelming majority
> of excellent employees, we are giving fair
> warning to that very, very small minority of
> violence inclined individuals that each and
> every act or threat of violence from this day
> forward will elicit an immediate and firm
> response that could, depending on the
> severity of the incident, include removal
> from the postal service.
>
> No one wants to work in an atmosphere of fear
> and intimidation.  It is in the interest of
> both Labor and Management to have a violence
> free environment.  We will do whatever it
> takes to provide that environment.

Id. ¶33.  The Zero Tolerance Policy was permanently posted on the

bulletin board in the New Fairfield Post Office after it was

issued on February 26, 2007.  Id. ¶34.

During the interview with Williams, Jeunes admitted that he

swore at Nichols.  Id. ¶35.  Williams testified in his EEO affidavit that after reviewing the witness statements, conducting a Pre-Disciplinary Interview with Jeunes, and talking with the supervisor, Walter Gasiewski, who was covering on October 26, 2007, he found that Jeunes used profanity and violated the Zero Tolerance Policy by threatening Nichols with physical violence, while Nichols was neither profane nor threatening towards Jeunes. Williams found no basis for issuing discipline to Nichols.[3]  Id. ¶36.

Williams decided to terminate Jeune's employment with the Postal Service and a Notice of Removal was issued on November 20, 2007. Id. ¶37.  In arriving at this decision, Williams considered Jeunes' disciplinary record with the Postal Service, specifically,

1.  On 07/26/07, Jeunes was issued a 7-Day Paper Suspension for: (1) Failure to be regular in Attendance; (2) Unsatisfactory Work Performance; and (3) Failure to Follow Instructions.

2.  On 03/03/07, Jeunes was issued a 14-Day Paper Suspension for Failure to Follow Instructions.

3.  On 11/28/06, Jeunes was issued a 7-Day Paper Suspension for Failure to be regular in Attendance.

---

[3]Although plaintiff denies this Local Rule 56(a)(1) statement, the Court reviewed defendant's exhibit 4 and the information is accurately stated. Plaintiff offered no evidence to show that Williams provided a false statement to the EEO and plaintiff offered no other evidence to show the facts are disputed. Accordingly, the Court deems paragraph 36 admitted. See Eiden v. McCarthy, F. Supp. 2d 333, 338 (D. Conn. 2008).

    4.    On 04/25/06, Jeunes was issued a Letter of Warning for Failure to be regular in Attendance.

Id. ¶38.

On November 20, 2007, the Postal Service terminated Jeunes' employment by issuing a Notice of Removal for "Unacceptable Conduct in violation of the Postal Service Code of Conduct Regulations and the Connecticut Zero Tolerance Policy."  Id. ¶39.

III.

Title VII: Disparate Treatment

To establish a prima facie discriminatory treatment case based on an adverse employment action, a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) 152(citing Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002)).

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting Galabya v. New York City Bd. of Educ., 202 F .3d 636, 640 (2d Cir. 2000)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary,

13

a less distinguished title, a material loss of benefits,
significantly diminished material responsibilities, or other
indices . . . unique to a particular situation." Feingold, 366
F.3d at 152 (internal quotation marks and alterations omitted).

"Once a plaintiff has made out a prima facie case, the
employer is required to offer a legitimate, nondiscriminatory
business rational for its conduct." Id. (citing McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Stern v.
Trustees of Columbia University in City of New York, 131 F.3d
305, 312 (2d Cir. 1997) ("defendant has the burden of producing,
through the introduction of admissible evidence, reasons for its
actions, which if believed by the trier of fact, would support a
finding that unlawful discrimination was not the cause of the
employment action."). If defendant states a neutral reason for
the adverse action, "to defeat summary judgment . . . the
plaintiff's admissible evidence must show circumstances that
would be sufficient to permit a rational finder of fact to infer
that the defendant's employment decision was more likely than not
based in whole or in part on discrimination." Stern, 131 F.3d at
312; Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir.
2000). A neutral reason "cannot be proved to be a 'pretext for
discrimination' unless it is shown both that the reason was
false, and that discrimination was the real reason." St. Mary's
Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in

14

original). In other words, the plaintiff must offer proof "through presentation of his own case and through cross-examination" that would allow a rational fact finder to conclude that the proffered reason was not the true reason for the adverse employment action. Carlton, 202 F.3d at 135 (internal citation omitted).

Defendant does not contest that plaintiff established his prima facie case of disparate treatment under Title VII as (1) plaintiff is an African-American of Haitian descent; (2) he was qualified for his position; and (3) his employment was terminated.

The Court finds that defendant provided a legitimate and non-discriminatory reason for terminating Jeunes. Following the October 26, 2007, incident, the Postal Service conducted an investigation by interviewing and gathering witness statements from both Josier Jeunes and Thomas Nichols,  as well as co-workers present at the time of the incident, Walter Gasiewski, Patricia Lamson, Vincenzo Gentili, John Coscia, George Jacob, and Wayne Garcia.[4]  These statements are part of the record and are uncontested.  Jacob Williams, Manager Customer Service at New Fairfield Post Office, conducted the investigation for the Postal

---

[4]It is noted that Wayne Garcia did not provide a written witness statement. He was interviewed by Williams on October 29, 2007, and Williams' interview notes are part of the record. [Def, Ex. 13].

Service.[5]  Williams concluded, after reviewing the witness statements of the incident, conducting a Pre-Disciplinary Interview with Jeunes, and talking with Walter Gasiewski, the supervisor who was covering on October 26, 2007, that Jeunes had used profanity and violated the Zero Tolerance Policy by threatening Nichols with physical violence, while Nichols was neither profane nor threatening towards Jeunes.  Williams found no basis for issuing discipline to Nichols.[6]  Moreover, Williams testified in his EEO affidavit that, based on a review of Jeunes' prior disciplinary record, the next step of progressive discipline was removal, "but I would have issued him a removal for these charges regardless of progressive steps because of the seriousness of [Jeunes]' actions in this case. It should also be noted that [Jeunes] admitted to me he was aware of the Zero Tolerance Policy and that he had, in fact, been present during Service Talks I gave on the subject. [Jeunes] admitted he had viewed the video "Working Together with Dignity and Respect." [Def. Ex. 4].

Where, as here, defendant advances a legitimate and non-discriminatory reason for the termination of employment, the

---

[5]Williams also conducted the Pre-Disciplinary Interview (PCI) with Jeunes. In addition, Williams reviewed Jeunes' prior disciplinary record and signed the Notice of Removal terminating plaintiff's employment. [Def. Ex. 4, 19].

[6]See Williams EEO Aff. Def. Ex. 4 and Notice of Removal, Def. Ex. 14.

plaintiff bears the burden of demonstrating that defendant's stated reason is a pretext for discrimination." <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 150 (2d Cir. 2000). "[A] reason cannot be proved to be a 'pretext for <u>discrimination</u>' unless it is shown <u>both</u> that the reason was false, <u>and</u> that discrimination was the real reason." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (emphasis in the original).  In order to survive summary judgment at this stage,  plaintiff must establish there is a factual dispute about whether the defendant's proffered reason is pretextual and whether discrimination was a determinative factor in defendant's termination of employment.  <u>Macoas Soto v. Core-Mark Int'l., Inc.</u>, 521 F.3d 837, 841 (8th Cir. 2008).

Plaintiff contends that the investigation and termination of his employment was handled in a discriminatory manner. He first argues that the "investigation was conducted in a suspect manner." His evidence in support of this contention is: (1) Wayne Garcia did not provide a witness statement; and (2) "several" employees present (Paradise, Figueras, Almeida) were not interviewed.

While it is true that Wayne Garcia did not provide a written witness statement, Jacob Williams interviewed Garcia and memorialized the interview. Def. Ex. 13.  Plaintiff provides no evidence to suggest that Williams' statement inaccurately records the interview with Garcia, nor does plaintiff provide an

affidavit from Garcia to suggest that his interview statement is a false or inaccurate record.

Second, the fact that there may have been three other employees present on the date of the incident who did not provide witness statements and who were not interviewed as part of the Postal Service's investigation does not create an inference that the "investigation was conducted in a suspect manner." Plaintiff provides no basis for this Court to conclude that the investigation was conducted in a discriminatory manner. No evidence is provided to support this contention. Plaintiff did not provide affidavits from these three witnesses to show that their perception of the event differed from the statements provided by the other seven witnesses including Nichols. Rather, plaintiff asserts that because they were not interviewed, the "Postal Service conducted a selective and incomplete investigation." [Doc. #23 at 4]. There is no evidence that any of these witnesses would create a material issue of fact. Importantly, plaintiff failed to disclose these three witnesses in his interrogatory responses and during his deposition.[7] The

---

[7]In his reply, plaintiff argues he was "never asked to list people present and witness to the events of October 26, 2007." [Doc. #23 at 4]. However, defendant's interrogatories Nos. 3, 5 and 7, specifically ask plaintiff to name "witnesses."

Interrogatory No. 3 states: "Please identify and describe all acts of discrimination, harassment or retaliation you claim to be a part of this lawsuit. For each individual act, please include who committed the act(s) towards you, when the act(s) were committed, and any witnesses to the act(s)." Def. Ex. 3 at 2

first time defendant was informed that there might have been

other witnesses to the incident was in plaintiff's brief in

opposition to summary judgment.   Accordingly, plaintiff does not

raise an inference of pretext on these two grounds.

Plaintiff also contends that Thomas Nichols, a Postal

Service employee with fewer years of service then Jeunes, was not

disciplined for his "provocation and instigation" during the

incident, whereas Jeunes' employment was terminated.   Plaintiff

argues that this is evidence of disparate treatment.

A plaintiff may raise an inference of discriminatory intent

by showing that the employer treated him less favorably than a

similarly situated employee outside his protected group. Lee v.

Connecticut, 427 F. Supp. 2d 124, 131 (D. Conn. 2006) (citing

Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir.2000)). To be

similarly situated, the individuals with whom the plaintiff

attempts to compare himself must be similarly situated "in all

---

(emphasis added)..

Interrogatory No. 3 states: "Please identify and describe
all acts of discrimination, harassment or retaliation for which
you seek to recovery damages.  For each individual act, please
include who committed the act(s) towards you, when the act(s)
were committed, and any witnesses to the act(s)." Def. Ex. 3 at 3
(emphasis added).

Interrogatory No. 7 states: "Please identify and describe
each time that the plaintiff opposed discrimination, harassment,
or retaliation that the plaintiff alleges led to retaliation.
For each incident, please describe what the plaintiff said/did,
the date, who the plaintiff spoke or wrote to and witnesses to
the opposition." Def. Ex 3 at 4 (emphasis added).

material respects." <u>Shumway v. United Parcel Serv., Inc.</u>, 118
F.3d 60, 64 (2d Cir. 1997) (citing <u>Mitchell v. Toledo Hosp.</u>, 964
F.2d 577, 583 (6th Cir. 1992)).

"What constitutes 'all material respects' . . . must be
judged based on (1) whether the plaintiff and those he maintains
were similarly situated were subject to the same workplace
standards and (2) whether the conduct for which the employer
imposed discipline was of comparable seriousness . . . . Hence
the standard for comparing conduct requires a reasonably close
resemblance of the facts and circumstances of plaintiff's and
comparator's cases, rather than showing that both cases are
identical." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir.
2000) (internal citations omitted).

Plaintiff contends that he and Thomas Nichols are similarly
situated in "all material respects" as they both held the same
position with the Postal Service and they were both involved in
the October 26, 2007, incident. "Mr. Nichols was the instigator,
Mr. Jeunes used profanity." [Doc. #21 at8].  But only Jeunes was
disciplined for the incident. This discipline, plaintiff argues,
"gives rise to an inference of discrimination. [Jeunes] was
treated differently for no apparent legitimate reason." <u>Id.</u> at 9.

The first problem with this analysis is that plaintiff has
not provided any evidence that Nichols provoked/instigated the
incident other than his own self-serving affidavit and conclusory

deposition testimony.[8]  Witnesses recalled that Nichols told plaintiff more than once that he had a package in the throw back case for delivery. Witnesses and Nichols stated that Jeunes gave the impression that he had not heard Nichols the first time Nichols alerted Jeunes about the package. All of the witnesses, including plaintiff, recalled that plaintiff used profanity; although plaintiff denied inviting Nichols to fight, witness statements established otherwise.  "Where a plaintiff's argument is based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct, a court may find that no material issue of fact exists and grant summary judgment." Tojzan v. New York Presbyterian Hosp., No. O0 Civ. 6105(WHP)  2003 WL 1738993, *4 (S.D.N.Y. Mar. 31, 2003) (citing Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997)).

Jeunes' and Nichols' situations differ in another material respect. Jeuness had several disciplinary actions against him and termination of employment was the next step in his progressive discipline. There is no evidence that Nichols had a disciplinary record with the Postal Service.  Further, Jeunes admitted to using profanity. Nichols did not. Nor are there any witness

---

[8]See Jeunes Aff. ¶5, ("Thomas Nichols was the instigator of this incident on October 26, 2007."); Pl. 56(a)(2) Stat. ¶3 ("Nichols greeted Mr. Jeunes with disparaging banter."); ¶6 ("Thomas Nichols began the verbal harassment of Mr. Jeunes by yelling at him across the room.").

statements to suggest otherwise.  Finally, Jeunes denies "egging on Nichols to go outside," def. ex. 6, or threatening physical violence; however, Williams' investigation of the incident clearly established that the Postal Service had a legitimate non-discriminatory basis for terminating Jeunes' employment. Williams found that Jeunes used profanity and violated the Postal Service's Zero Tolerance Policy by threatening Nichols with physical violence.  Williams found that Nichols was neither profane or threatening with Jeunes.  Williams also considered Jeunes' prior disciplinary history with the Postal Service. Defendant has shown a good faith belief, based on reasonable and credible evidence that plaintiff used profanity, threatened violence and violated the Zero Tolerance Policy; this is a non-discriminatory reason to terminate plaintiff's employment.  Allen v. Highlands Hosp. Corp., 545 F.3d 387, 398 (6th Cir. 2008)  ("An employer has an honest belief in his rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made." (quoting Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 598 (6th Cir. 2007)).

On this record, plaintiff has not established any facts to support a finding of pretext. "In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred . . . ."

_Macoas Soto v. Core-Mark Int'l., Inc._, 521 F.3d 837, 842 (8th Cir. 2008) (finding plaintiff's own deposition testimony "does not create a factual dispute about the employer's good faith belief he was sleeping on the job nor does it in any other way call into question the employer's stated reason for terminating him."); see also, _Brady v. Office of the Sergeant of Arms_, 520 F.3d 490, 496 (D.C. Cir. 2008) (question is whether employer "honestly and reasonably" believed incident occurred, not whether it actually occurred); _Michael v. Caterpillar Fin. Servs. Corp._, 496 F.3d 584, 598 (6th Cir. 2007) ("[The employee's] disagreement with the facts uncovered in [the employer's] investigation does not create a genuine issue of material fact that would defeat summary judgment as long as an employer has an honest belief in its proffered nondiscriminatory reason." (internal quotation marks omitted));   _Griel v. Franklin Med. Ctr._, 234 F3d 731, 732 (1st Cir. 2000) ("If the question in this case was whether [plaintiff's] medical choices were defensible, quite possibly the expert evidence she offered would have created a jury issue. But the ultimate issue in a discrimination case is whether the hospital's reason for discharging her was because it believed that she was not a safe nurse." (emphasis in original)'; _Chinander v. Anderson Windows, Inc._, No. 07-4565 (DWF/AJB), 2008 U.S. LEXIS 96354, *12 (D. Minn. Nov. 26, 2008) ("[Plaintiff] concedes that the relevant inquiry here is whether [the employer]

believed [plaintiff] was guilty of conduct justifying his discharge, namely his alleged theft from the cafeteria.").

Plaintiff may disagree with the statements considered by the Postal Service, but the Postal Service is nonetheless entitled to rely upon its investigation in making business judgment determinations. "[F]ederal courts are not in the business of adjudging whether employment decisions are prudent or fair. Instead, [a federal court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) (quoting Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)). Jeunes argues that the Postal Service should have believed him over the numerous witnesses; however, he is not allowed to substitute his judgment for that of the Postal Service.  The witness statements considered during the investigation of the incident provide one version of the event.  Apart from Jeunes' personal recollections of the incident, he has presented no evidence that any of the statements provided by his co-workers were false or that the decision to terminate his employment was linked to the claimed grounds of discrimination.  Id.  There is nothing in the record to indicate that the Postal Service's investigation and/or the decision to terminate Jeunes' employment was motivated by his race or ethnicity.

Finally, Jeunes cannot rely on a "similar incident" from

24

2001, involving two Caucasian employees, Dean Perry and Chris Witkosky, to draw an inference of discrimination in favor of Jeunes. In his deposition, plaintiff alleged the two men got into a physical altercation and were suspended from work, not discharged.  Def. Ex. 1, 91:9-93:17. Notably absent from Jeunes' assertion are citations to the record.[9] During plaintiff's deposition he referenced two individuals but was unable to remember their names. Def. Ex. 1, 91:9-93:17.  These men may not serve as comparators similarly situated to plaintiff.  Plaintiff provides no information about Perry and Witkosky, their disciplinary histories, the circumstances of the 2001 incident, or the details of the Postal Service investigation, if any. Further, Marie Saputa, a different supervisor, was responsible for disciplining these two men. Def. Ex. 1, 92:19-25; see Ellis v. UPS, Inc., 523 F.3d 823, 826 (7th Cir. 2008) ("Different decision makers may rely on different factors when deciding whether, and how severely, to discipline an employee . . . .  So to be similarly situated, a [comparator] must have been treated more favorably by the same decisionmaker that fired the [plaintiff].").  Importantly, the February 2007 Zero Tolerance

---

[9]At the deposition, plaintiff was unable to recall the names of these two men.  Plaintiff's counsel stated, "We can try to find it. We'll produce that information, either produce it ourselves by finding it out independently or we'll request [it] from you through discovery." [Def. Ex. 1 92:8-12]. "We'll find it out. Don't worry about it." [Def. Ex. 1 93:1-2]. No further information was provided by plaintiff in opposition to summary judgment.

Policy was not in effect at the time of the 2001 incident. Accordingly, the Court finds that, on this record, the 2001 disciplinary incident may not serve as a comparator.

Hostile Work Environment Claim

Defendant argues that Jeunes failed to oppose summary judgment on his hostile work environment claim and the Court should deem this claim abandoned. [10]   In his reply brief, plaintiff states that he "has not claimed hostile work environment in his Complaint." [Doc. #23 at 3].  Accordingly, defendant's Motion for Summary Judgment is denied as moot on the hostile work environment claim.

Affirmative Defense of Lack of Mitigation

In light of the entry of summary judgment on the Title VII claim, the Court need not reach defendant's argument on the affirmative defense of lack of mitigation.  Accordingly,

_____

[10]Defendant initially argued that for entry of summary judgment on three grounds: (1) plaintiff did not plead in his complaint a hostile work environment claim; (2) the events that he claims as part of the hostile work environment claim were never exhausted; and (3) to the extent that the Court considers his hostile work environment claim, it fails on its merits. [Doc. #17 at 20].  Defendant's reply brief sought entry of summary judgment on the grounds that: (1) plaintiff failed to respond to the Postal Services's 56(a)(1) statement on the hostile work environment claim and mitigation issues, and thus the Court should deem these paragraphs admitted; and (2) plaintiff also failed to oppose summary judgment offering no argument in opposition thus the claims of hostile work environment and lost wages should be deemed abandoned. [Doc. #22].

defendant's Motion for Summary Judgment is denied as moot on the affirmative defense of mitigation.

CONCLUSION

For the reasons stated, defendants' Motion for Summary Judgement [**Doc. #17]** is **GRANTED** in part and **DENIED as moot** in part.[11]

ENTERED at Bridgeport this 3rd day of September 2009.

_/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

_____

[11]This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #16] on February 2, 2009, with appeal to the Court of Appeals.